**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH HAUSCHILD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 cv 05032** |
| | ) | |
| **RICK HARRINGTON,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In 2003, Joseph Hauschild was convicted of attempted murder, home invasion, and armed robbery, and was sentenced to 67 years in prison. Hauschild was just 17 years old at the time he committed these crimes, and his sentence renders him ineligible for parole until he is well past age 70. Having exhausted appellate and postconviction proceedings in Illinois state courts, Hauschild now petitions this court for a writ of habeas corpus under 28 U.S.C. § 2254. He raises two primary grounds for relief. First, he argues that the 67-year sentence, imposed on him for offenses he committed as a juvenile, is unconstitutional under *Graham v. Florida*, 560 U.S. 48 (2010). The Supreme Court held in *Graham* that imposing a life without parole sentence on a juvenile who did not commit homicide violates the Eighth Amendment because it provides no meaningful opportunity to seek release based on subsequent rehabilitation. Second, Hauschild argues that Illinois' sentencing scheme, which subjected him to a 53-year mandatory minimum sentence, was independently unconstitutional because it amounted to a *de facto* life sentence for crimes he committed as a juvenile. *See Miller v. Alabama*, 567 U.S. 460 (2012) (holding that mandatory life without parole sentences, even for juvenile homicide offenders, are unconstitutional for those who were under 18 when they committed the underlying offense). *Miller* also made clear that juvenile *homicide* offenders could still receive a life-without-parole sentence, but only if the judge affirmatively opted to impose one after first considering mitigating circumstances like the offender's youth. *Id.* at 489.

The Illinois Appellate Court's final adjudication on the merits of Hauschild's claim held that he was effectively given a life without parole sentence, but that the sentence does not violate the Constitution because the trial judge had complied with *Miller* by considering Hauschild's youth before imposing it. But because Hauschild had committed non-homicide crimes, the relevant Supreme Court precedent was *Graham*, not *Miller*, and the relevant question is whether his sentence was long enough to deny him a meaningful opportunity for release, not whether the judge had thought about it first. Because the Illinois Appellate Cout applied the wrong law to Hauschild's claim, this court may independently reach the merits. And doing so, the court agrees with Hauschild that his sentence violates the Eighth Amendment, and orders that he be resentenced consistent with *Graham*.

## BACKGROUND

### I.     Trial Proceedings and Direct Appeal

Around 1:30 a.m. on August 14, 2001, Hauschild (then age 17) and Ethan Warden (then age 15) broke into Thomas and Wendy Wright's home in Saint Charles, Illinois. *People v. Hauschild*, 2022 IL App (2d) 131040-UC ("*Hauschild (2022)*"), ¶¶ 4–5, *appeal denied,* 210 N.E.3d 786 (Ill. 2023), and *cert. denied sub nom. Hauschild v. Illinois*, 144 S. Ct. 225, 217 L. Ed. 2d 81 (2023).[1] The Wrights' son Chris, an acquaintance of Hauschild and Warden, had died by suicide the previous morning, and Hauschild and Warden broke in with the goal of stealing $10,000 they believed the Wrights kept in a safe inside the house. *Id.* ¶¶ 4, 6. Their goal was to run off with the money and move to New York; Ethan thought he "could be a DJ" and Hauschild "was going to become a rapper." *Id.* ¶ 6.

When the boys entered the home's master bedroom, masked and armed, they discovered the Wrights in bed, awakened by the commotion. *Id.* ¶ 5. Mr. Wright "initially complied with" the

---

[1]     The court relies on prior state-court opinions in this case when recounting its history. Respondent offered to provide Hauschild's state-court records to this end if necessary, but the court does not need them to resolve Hauschild's petition. (*See* Resp. [11] at 1 n.1.)

boys' demands and retrieved a lockbox from another room, but a "struggle . . . ensued" and "several rounds of ammunition were fired." *People v. Hauschild*, 364 Ill. App. 3d 202, 206, 845 N.E.2d 74, 78 (2d Dist. 2006), *aff'd in part, rev'd in part,* 226 Ill. 2d 63, 871 N.E.2d 1 (2007). Mr. Thomas was shot four times, and the family's dog was struck by a stray bullet. *Hauschild (2022)* ¶ 5. Mrs. Wright ran to her husband and, while she dialed 9-1-1, "one of the robbers returned to the bedroom and fired a single shot at her," which missed; Hauschild and Warden then fled the premises. *Id.* Everyone survived. *Id.* Later, the boys found less than $30 in the lockbox. *Id.* ¶ 7. Both boys were arrested nine days later. Warden agreed to plead guilty and testify against Hauschild in return for a sentence of twelve years. *Id.* ¶ 6. According to Warden, Hauschild had "stole[n] the guns and the car that were used in the robbery" and, while fleeing the home, had "ordered Warden to go back upstairs and 'whack the bitch,' meaning Wendy." *Id.* ¶ 7.

Hauschild, who was represented by counsel at trial, was convicted by a jury in 2003 of attempted first degree murder (720 ILCS 5/8-4(s), 9-1(a)(1)); home invasion (720 ILCS 5/12-11(a)(3) (current version at 720 ILCS 5/19-6)); and armed robbery (720 ILCS 5/18-2(a)(4)). *Id.* ¶ 8; *People v. Hauschild*, No. 01CF2403, 2003 WL 25860395 (Ill. Cir. Ct. May 23, 2003). Relevant to sentencing, the jury also made a special finding that Hauschild had discharged a firearm while committing the felonies. *Hauschild (2022)* ¶ 8; 720 ILCS 5/12-11(c) (current version at 720 ILCS 5/19-6). The combination of "[t]he level of offenses" and "the serious bodily harm inflicted on [Thomas Wright] compelled the court to issue mandatory consecutive sentences," as required by Illinois law. *Hauschild (2022)* ¶ 8 (citing 730 ILCS 5/5-8-4(a)); *see also* 720 ILCS 5/18-2; 720 ILCS 5/8-4(c)(1). As a result, in light of the minimum statutory sentence for each offense, Hauschild faced a sentence of at least 53 years in prison and up to 125 years or "a possible sentence of natural life." *Id.*

After what the appellate court described as a "thorough hearing," Hauschild was sentenced to a total of 65 years' imprisonment: 35 years for home invasion, including a 20-year enhancement for discharging a firearm during its commission; 18 years for attempted murder;

and 12 years for armed robbery, all to run consecutively.  *People v. Hauschild* ("*Hauschild (2007)*"), 226 Ill. 2d 63, 69, 871 N.E.2d 1, 4 (2007).[2]  The trial court declined to enhance Hauschild's sentences for attempted murder and armed robbery, believing that to do so would violate the Illinois Constitution's proportionate penalties clause.  *Id*. at 4–5.  Because the crimes were violent, Illinois law mandated that Hauschild serve 85% of that sentence before parole eligibility.  *Hauschild (2022)* ¶ 9; 730 ILCS 5/3-6-3(a)(2)).

## II.     Direct Appeal

Through counsel, Hauschild appealed aspects of both his convictions and sentence.  On a first go, in October 2005, the appeals court affirmed his convictions but found that the sentences he received for home invasion and robbery violated Illinois' proportionate penalties clause.  *See Hauschild (2007)*, 226 Ill. 2d at 69–70, 871 N.E.2d at 5.  But the day after the court issued its decision, the Illinois Supreme Court changed its then-applicable legal test for determining disproportionate penalties involving sentencing enhancements, *see People v. Sharpe*, 216 Ill.2d 481, 298 Ill. Dec. 169, 839 N.E.2d 492 (2005), and the State successfully petitioned for a rehearing in Hauschild's case based on *Sharpe*.  *Hauschild (2007)*, 226 Ill. 2d at 70, 871 N.E. 2d at 5.  On rehearing, the appellate court again affirmed Hauschild's convictions and affirmed his 35-year sentence for home invasion, but ordered the trial court to resentence him on his attempted murder and armed robbery convictions, adding statutorily mandated enhancements to each.  *Id.* at 70–71, 871 N.E. 2d at 5 (citing *Hauschild*, 364 Ill. App. 3d at 211–29, 845 N.E.2d at 81–96).  The appellate court also confirmed that Hauschild's "sentences for the[] three convictions must run consecutively."  *Hauschild*, 364 Ill. App. 3d at 227, 229, 845 N.E.2d at 94, 96.

Hauschild appealed.  He raised three issues: whether Illinois' proportionate penalties clause mandated that his armed robbery conviction be reduced to "simple robbery," since the

---

[2]     Hauschild received an additional two years' sentence for criminal damage to property for injuries suffered by the Wrights' dog, but this term ran concurrently with his home invasion sentence.  *See id.*

elements were the same but produced disparate sentences; whether his "existing [unenhanced] sentences for armed robbery and attempted murder were authorized by the law in effect at the time of sentencing" and thus not voided by *Sharpe*'s new test; and whether his aggregate 65-year sentence was disproportionately harsh compared to the 12-year sentence Warden received. *Hauschild (2007)*, 226 Ill. 2d at 71, 871 N.E. 2d at 5–6. The Illinois Supreme Court agreed on the first argument but not the latter two; it noted that the armed robbery statute violated the proportionate penalties clause under *Sharpe*,[3] and, in accordance with *Sharpe*, instructed the trial court to "conduct a new sentencing hearing wherein the 15-year penalty mandated by 720 ILCS 5/8-4(c)(1)(B) . . . is added to the base term of between 6 and 30 years for" Hauschild's attempted murder conviction, and to separately sentence him to a term within a 6-to-30-year range for the armed robbery. *Hauschild (2007)*, 226 Ill. 2d at 68, 91–92, 871 N.E.2d at 17. The Court confirmed that "the trial court will be required to impose a consecutive aggregate sentence of similar or greater length" to the 65-year sentence Hauschild already faced, and noted that "[t]he minimum cumulative sentence which the trial court could impose on remand is 62 years' imprisonment": 35 years for home invasion, at least 6 years for attempted murder (plus a 15-year enhancement for using a firearm in its commission), and at least 6 years for armed robbery. *Id.* at 89, 89 n.3, 871 N.E.2d at 16.

In 2008, on remand, the trial court resentenced Hauschild to a term of 67 years (35 for home invasion; 24 for attempted murder; and 8 for armed robbery). *Hauschild (2022)* ¶ 10; *People v. Hauschild*, 2015 IL App (2d) 131040-U ¶ 2, *appeal denied, judgment vacated,* 75 N.E.3d 1051 (Ill. 2016). Illinois law requires Hauschild to serve 85% of his sentence, meaning that he will not be eligible for parole until he has served about 57 years in prison. *Hauschild (2022)* ¶ 22. In

---

[3] This did not directly affect Hauschild, because the sentencing judge had only given him 12 years for the armed robbery after citing precedent that separately held, using a pre-*Sharpe* test, that Illinois' 15-year enhancement for armed robbery violated the state's proportionate penalties clause. *See id.* at 75, 871 N.E.2d at 8 (citing *People v. Walden,* 199 Ill.2d 392, 397, 769 N.E.2d 928 (2002), *overruled by People v. Sharpe,* 216 Ill.2d 481, 839 N.E.2d 492 (2005)).

other words, as he has been in prison since 2001, he will "not [be] eligible for parole until 2058, when he would be 74." *Id.*[4]

## III. Collateral Proceedings

There have been several relevant legal developments in the years since the conclusion of Hauschild's direct appeal and resentencing. First, in 2010, the Supreme Court decided *Graham v. Florida*, "hold[ing] that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." 560 U.S. at 74. Instead, the Court held, the Constitution requires that such defendants be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. And in 2012, the Supreme Court held in *Miller v. Alabama* that the Eighth Amendment prohibits, even for juveniles who had committed homicide, a "sentencing scheme that *mandates* life in prison without possibility of parole . . . ." *Miller*, 567 U.S. at 479 (emphasis added). Instead, the Constitution allows such a sentence for a juvenile homicide offender only if the judge affirmatively opts to impose one after considering the defendant's youth and rehabilitative potential. *See id.* at 477–79. In turn, Hauschild sought collateral review of his sentence in 2013.

### A. Petitioner's Collateral Proceedings

In 2013, Hauschild, acting *pro se*, filed a federal habeas petition in this district court but asked the court to stay its ruling while he exhausted his collateral attack in Illinois courts. (*See* Petition [1]; Mot. to Stay [6].)[5] In his 2013 petition to this court, he explicitly invoked *Miller*, arguing

---

[4] In a later opinion on collateral review, the appellate court claimed that Hauschild would not be eligible for parole until the age of 75, not 74. *People v. Hauschild*, 2015 IL App (2d) 131040-U ¶ 7, *appeal denied, judgment vacated,* 75 N.E.3d 1051 (Ill. 2016). Any difference does not change the result here.

[5] Petitioner appears to have filed his federal and state collateral claims around the same time out of concern that he not run afoul of 28 U.S.C. § 2244(d)(1), which creates a one-year statute of limitation for filing federal habeas applications challenging state-court judgments, including within a year of "the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review . . . ." 28 U.S.C. § 2244(d)(1)(C).

that *Miller* applied retroactively to his sentence and rendered it unconstitutional because "67 years as a juvenile is unconstitutional and equivalent to life without parole even though it was a non-homicide." (*See* Petition at 5.) The State saw no reason for a stay of this case because in the State's view, Hauschild's claim was "plainly meritless." (Resp. [11] at 2.) The State argued that under the rule of *Teague v. Lane*, 489 U.S. 288 (1989), *Miller* did not apply retroactively to Petitioner's case, and even if it did, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) would bar relief because no clearly established Supreme Court precedent bore on his claim that a long term-of-years sentence violated the Eighth Amendment. (*Id.* at 2–3.) Still acting pro se, Petitioner replied by urging that both *Miller* and *Graham* are retroactively applicable because they prohibit a certain species of punishment for a certain class of offender, thus falling into an exception to *Teague*'s non-retroactivity principle for new rules that prohibit a certain kind of punishment for a certain kind of offense or offender. (Reply [13] at 1–2; *see also Teague*, 492 U.S. at 307; *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989) (noting exception for rules "prohibiting a certain category of punishment for a class of defendants because of their status or offense").) He argued further that *Miller* and *Graham* rendered his 67-month sentence unconstitutional. (*Id.* at 2.)

In a December 2013 Order, this court granted Petitioner's request for a stay pending the resolution of his collateral proceedings in state court. (Ord. [14] at 1.) The court noted that

---

In one sense, this appears to have been an overabundance of caution; Hauschild's state-court collateral proceedings would toll the one-year limitations period for his federal habeas claim. *See* 28 USCA § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.") On the other hand, while filed within a year of *Miller*, Hauschild's petition appears to post-date *Graham* by a couple of years, potentially rendering his invocation of that case untimely. The State has not challenged the timeliness of this petition, however (*see* Status Report [99]), and the court considers it waived. *See Day v. McDonough*, 547 U.S. 198, 209 (2006) (holding that "district courts are permitted, but not obliged, to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition"); *see also* Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts (noting that the respondent's answer to a habeas petition "must state whether any claim in the petition is barred by . . . a statute of limitations").

"because Petitioner himself was not convicted of murder," *Graham* "appears to be more directly relevant to his claim" than *Miller*. (*Id.*) Additionally, the court noted that whether a term-of-years sentence constituted a life sentence was "an unsettled question in Illinois" and that, rather than dismissing the habeas petition outright, it made sense to "allow[] the state courts a first opportunity to adjudicate the claim." (*Id.* at 1–2.)

Hauschild's pro se state petition then snaked through Illinois courts for about ten years. At the first stage, the Kane County trial court dismissed his petition, claiming the principle in *Miller* was not violated because the sentencing judge had considered Hauschild's "youth and rehabilitative potential" when sentencing him. *Hauschild (2022)* ¶ 12. As the Second District Illinois Appellate Court would later explain, "the sentencing judge found that, despite Hauschild's admirable progress in presentence custody programs, his rehabilitative prospects were fairly low, especially when considered alongside his cold meticulous planning of the attack on the Wrights." *Id.*

On what would turn out to be the first of three times it addressed Hauschild's petition, the appellate court affirmed his petition's dismissal. *People v. Hauschild*, 2015 IL App (2d) 131040-U, *appeal denied, judgment vacated,* 75 N.E.3d 1051 (Ill. 2016). In that appeal, Petitioner relied primarily on *Graham* as opposed to *Miller*, and argued that, because he would not be eligible for parole "until he is 75 years old, which is greater than his average life expectancy of 71 years," he had received a "*de facto* life sentence, which is arguably prohibited by *Graham* . . . ." *Id.* ¶ 7. The appeals court rejected Petitioner's claim, relying on then-in-effect Illinois precedent that distinguished term-of-years sentences from life sentences. *Id.* ¶ 8. Still acting pro se, Hauschild petitioned for leave to appeal, *People v. Hauschild*, 75 N.E.3d 1051 (Ill. 2016), and, while that petition was pending, the Illinois Supreme Court issued an opinion in another case holding that *de facto* life sentences for juveniles do trigger the Eighth Amendment's protections. *People v. Reyes*, 407 Ill. Dec. 452, 63 N.E.3d 884. Soon after, the Illinois Supreme Court denied Hauschild's petition for leave to appeal, but nonetheless exercised its supervisory authority to

"direct[]" the appellate court to vacate and reconsider its judgment in light of *Reyes* and "determine if a different result is warranted." *People v. Hauschild*, 75 N.E.3d 1051 (Ill. 2016).

On the second go, the Illinois Appellate Court, Second District again denied Hauschild's petition, for two reasons. First, the court characterized *Reyes* (and *Miller* by extension) as "requir[ing] only that we evaluate whether the defendant's mandatory minimum sentence was an unsurvivable term of years." *People v. Hauschild*, 2018 IL App (2d) 131040-B ¶ 19, *appeal denied, judgment vacated*, 183 N.E.3d 868 (Ill. 2021). In the appellate court's view, Hauschild's mandatory "minimum 53-year-sentence" afforded him the prospect of release at the age of 62, and thus "would not have exposed him to an unsurvivable term." *Id.* Second, the court sought to distinguish *Graham*, claiming that there, unlike here, the juvenile "was given a discretionary *life* sentence for a *single* nonhomicide offense." *Id.* ¶ 20 (emphases in original). Citing to a Minnesota Supreme Court decision, the court noted the "unremarkable proposition" that there is no constitutional prohibition against "punish[ing] a person who commits two, three, four or even more crimes more severely than a person who commits a single crime." *Id.* ¶ 21 (quoting *State v. Ali*, 895 N.W.2d 237, 243 (Minn. 2017)). In other words, because Hauschild's 67-year sentence stemming from the home invasion was the product of adding three consecutive term-of-years sentences for convictions on three counts, rather than a single sentence for a single conviction, *Graham* did not apply.

Hauschild again appealed, and again, the Illinois Supreme Court technically denied his petition for leave to appeal but simultaneously vacated the judgment, asking the court to again reconsider Hauschild's sentence in light of yet another new decision: *People v. Buffer*, 434 Ill. Dec. 691, 137 N.E.3d 763 (Ill. 2019), which again bore on *de facto* life sentences and *Miller*. *People v. Hauschild*, 183 N.E.3d 868 (Ill. 2021). In *Buffer*, the defendant had been found guilty of four counts of first-degree murder, and, specifically, of firing a gun that caused the victim's death; he was 16 years old at the time of the offense conduct. *Buffer*, 137 N.E.3d at 766. Buffer faced a 45-year mandatory minimum sentence and ultimately, the sentencing judge merged his

four murder counts and sentenced him to a 50-year term (25 years for first degree murder, plus a mandatory 25-year add-on for firing the weapon that caused the death). *Id.* at 766, 774. The Illinois Supreme Court determined that Buffer's sentence violated the principle of *Miller*, both because the mandatory minimum sentence of 45 years constituted a mandatory *de facto* life sentence, and separately because "the circuit court failed to consider defendant's youth and its attendant characteristics in imposing" the 50-year sentence. *Id.* at 774. In reaching this conclusion, the Court held that a prison sentence "greater than 40 years" constitutes a *de facto* life sentence for purposes of the Eighth Amendment's restrictions on sentencing those who were juveniles at the time of their offense conduct. *Id.*

In identifying this "40 years" standard, the *Buffer* Court cited a declaration of that standard that had been made by "the entity best suited to make such a determination—the [Illinois] legislature." *Id.* Specifically, the Court pointed out that, soon after *Miller* was decided, the Illinois legislature passed a law providing a different sentencing scheme for defendants who were less than 18 years old when they committed their crimes (regardless of the nature of the offense). *Id.* at 773 (citing 730 ILCS 5/5-4.5-105)). The Court concluded that *Miller* thus requires judges to consider a juvenile defendant's "youth and its attendant characteristics" before imposing any sentence and that the Illinois statute goes beyond *Miller,* requiring the judge to conduct this exercise before sentencing a juvenile on *any* offense, not just murder. *Id.* (citing 730 ILCS 5/5-4.5-105(a)). In a final subsection, the law also provides that, for juveniles convicted specifically of first-degree murder, "the court shall impose a sentence of not less than 40 years of imprisonment." *Id.* (quoting ILCS 5/5-4.5-105(c)). The *Buffer* Court, noting that "[t]he legislature evidently believed that this 40-year floor for juvenile offenders who commit egregious crimes complies with the requirements of *Miller*," chose to make that figure the ceiling; it thus held that a sentence of more than 40 years is a *de facto* life sentence implicating the Eighth Amendment

protections extended to sentences imposed on juvenile offenders.  137 N.E.3d at 773–74.[6]  In other words, because *Buffer* held that a sentence of more than 40 years without parole was equivalent to a life without parole sentence when imposed on a juvenile, such a sentence would violate *Miller* if the judge were either *forced* to impose it, or alternatively, if in a homicide case the judge *chose* to impose such a sentence without first considering the juvenile's youth and its attendant characteristics.

In light of *Buffer*, the Illinois Supreme Court remanded Hauschild's sentence for a third time, directing the Illinois Appellate Court on remand to consider *Buffer* in assessing the constitutionality of Hauschild's 67-year sentence.

## B.    The State Appellate Court's Final Adjudication of Hauschild's Petition

Finally, and for the third time, the appellate court held that "[o]n the merits . . . [Hauschild's] discretionary sentence was constitutional under *Miller*."  *Hauschild (2022)* ¶ 18.  The opinion began by noting that Hauschild, who remained unrepresented, "argues that under *Graham* . . . *Miller* . . . and *Buffer* . . . his 67-year term is a *de facto* life sentence, and that the most he could constitutionally receive as a juvenile non-homicide offender was 40 years in prison."  *Hauschild (2022)* ¶ 15.[7]  The appellate court agreed with Petitioner that, as the Supreme Court had made clear in 2016, "the *Miller* line of cases retroactively apply" to Hauschild's sentence.  *Id.* ¶ 17 (citing *Montgomery v. Louisiana*, 577 U.S. 190, 206–13 (2016); *People v. Davis*, 2014 IL 115595, ¶¶ 33–43, 6 N.E.3d 709, 720-23).  And the court agreed, further, that Hauschild had received a sentence

---

[6]    In a concurrence, Illinois Supreme Court Justice Burke criticized the majority's deferring to the legislature in defining the contours of a constitutional right (especially given the law's having set 40 years as a floor, not a ceiling), and instead suggested that the line for a *de facto* life sentence triggering *Miller* would be any sentence whereby "the earliest projected time of release exceeds an incarcerated minor's average life expectancy."  *Id.* at 777–78 (Burke, J., concurring).

[7]    The court also noted that Hauschild's petition had challenged "his potential 53-year minimum term" on the same grounds.  *Id.* ¶ 11.

that, under the rationale of *Buffer*, is a *de facto* life sentence. *Id.* ¶ 22. The State's argument to the contrary, according to the court, had "no merit" and was "plainly incorrect." *Id.*

Beyond this, the court appeared to conflate *Miller* and *Graham*, discussing both in the same breath in assessing Hauschild's sentence. The court found that "Hauschild's sentence was constitutional under *Graham*, *Miller*, and [Illinois] supreme court[] precedents." *Id.* ¶ 23. And in doing so, the court reasoned:

> Like *Graham* and *Miller* before it, the constitutional infirmity identified in *Reyes* and *Buffer* was the mandatory character of the defendant's sentence, which all but eliminated a meaningful sentencing hearing with consideration of the offender's age and individual characteristics. Here, defendant received a sentencing hearing.

*Id.* ¶ 25. Hauschild's sentence survived challenge, the appellate court concluded, because the sentencing judge had "considered all that *Miller* requires," including "repeatedly not[ing] Hauschild's age, his difficult childhood, his apparent intelligence, his immaturity, and his extensive juvenile criminal history" at a sentencing hearing whose transcript "number[ed] in the *hundreds* of pages . . . ." *Id.* ¶ 27 (emphasis in original). As "one more point of distinction," the court repeated a point from its prior order: that is, that while the defendant in *Graham* had received "a life sentence for a single nonhomicide offense," Hauschild "was convicted of *four* violent felonies . . . ." *Id.* ¶ 26 (emphasis in original). This distinction was significant, the court stated; it again invoked the language in the Minnesota case, *State v. Ali,* and stated that "a defendant who 'has subjected himself to a severe penalty' by committing multiple offenses has only himself to blame; 'the unreasonableness is only in the number of offenses which [he] has committed.'" *Id.* (quoting *O'Neil v. Vermont*, 144 U.S. 323, 331 (1892)).

As the appellate court read the relevant precedents, "[t]he state and federal constitutions 'allow[] juvenile offenders to be sentenced to life without parole as long as the sentence is not mandatory and the sentencing court had discretion to consider youth and attendant characteristics.'" *Id.* ¶ 29 (quoting *People v. Dorsey*, 2021 IL 123010, ¶ 40, 183 N.E.3d 715, 727). The court concluded by applying this reasoning to Hauschild's claim: "Hauschild was not

subjected to a mandatory life sentence and the record shows that the sentencing court did consider his youth and its attendant characteristics. Nothing more was required."  *Id.*

This time, the Illinois Supreme Court issued a one-sentence refusal to hear Hauschild's appeal.  *People v. Hauschild*, 210 N.E.3d 786 (Ill. 2023) ("Petition for Leave to Appeal Denied."). The United States Supreme Court also denied certiorari.  *Hauschild v. Illinois*, 144 S. Ct. 225, 217 L. Ed. 2d 81 (2023).

### C.    Federal Habeas Developments After Hauschild Exhausted State Collateral Review

While Hauschild's final petition for writ of certiorari to the U.S. Supreme Court was pending, he filed an amended petition before this court (Am. Compl. [94]).  After the Supreme Court denied certiorari on Hauschild's final state court ruling, Respondent filed a status report in which it recommended that this court lift its stay on considering Hauschild's federal habeas claim (Status [99] at 1).   In that status report, the State repeated verbatim the arguments it had "articulated in [its] response" back in 2013; that is, that "petitioner's claim is barred by the non-retroactivity principle established by *Teague,*" and that since "the state appellate court's judgment rejecting petitioner's claim . . . was neither contrary to, nor an unreasonable application of, Supreme Court precedent," AEDPA barred the claim from being relitigated in federal court.  (*Id.* at 2–4.)  On October 26, this court lifted the stay, finding that no further briefing was necessary but giving Petitioner, who remained unrepresented, an opportunity to respond in no longer than five pages.  (Minute Ord. [100].)

Petitioner did so, arguing in two submissions that *Graham* and *Miller* both apply retroactively, and that the Illinois appellate court "misapplied *Graham*" because it found his sentence constitutional while "specifically rul[ing] that Petitioner has a *de facto* life sentence"— something that *Graham* prohibits for nonhomicide juvenile offenders like Hauschild.  (Supp. Resp. [107] at 2 (quoting *Graham*, 560 U.S. at 75).)  Stressing that *Graham* requires that a sentencing court "provide 'some meaningful opportunity to obtain release based on demonstrated maturity

and rehabilitation,'" Hauschild pointed out that "[e]ven though [the] sentencing judge took some consideration of his age, Petitioner has <u>no</u>" such opportunity to obtain release due to his *de facto* life sentence.  (Resp. [104] at 2–3. (emphasis in original) (quoting *Graham*, 560 U.S. at 75).)  The government did not file a reply.

## DISCUSSION

Under the federal habeas statute, a district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  This court's limited capacity to review such judgments on their merits is circumscribed in two other important ways: one, the non-retroactivity principle raised in *Teague v. Lane*, 489 U.S. 288 (1989); and two, § 2254(d)'s requirement of high deference to the state's adjudication of the petitioner's claim.  The State challenges Hauschild's petition on both grounds, addressed below.

### I.    Retroactivity

"[A] new constitutional rule of criminal procedure does not apply, as a general matter, to convictions that were final when the new rule was announced."  *Montgomery v. Louisiana*, 577 U.S. 190, 198 (2016), *as revised* (Jan. 27, 2016) (citing *Teague v. Lane*, 489 U.S. 288 (1989)). This bar on retroactivity prevents most petitioners from seeking habeas review predicated on a change in the law.  If, however, the new constitutional rule is *substantive* as opposed to procedural—that is, if the rule "alters the range of conduct or the class of persons that the law punishes"—it will "generally apply retroactively" on collateral review.  *Welch v. United States*, 578 U.S. 120, 128 (2016) (quoting *Schriro v. Summerlin,* 542 U.S. 348, 351, 353 (2004)).

Respondent argues that *Teague* bars Petitioner's claim because "at the time petitioner's conviction became final, there was (and is now) no rule holding that a court must consider a juvenile defendant's age before sentencing him to a term of years in prison."  (Status [99] at 2.) In other words, Respondent argues that there is no new rule relevant to Petitioner's claim *at all*,

let alone one that could apply retroactively. But this argument ignores the case's history: after Hauschild's direct appeal had concluded, both he and the Illinois courts that adjudicated his claims have explicitly pointed to two Supreme Court cases, *Graham* and *Miller*, which announced constitutional rules prohibiting punishing juveniles in certain ways. *See Montgomery v. Louisiana*, 577 U.S. 190, 201, 206 (2016), *as revised* (Jan. 27, 2016) (identifying *Graham* and *Miller* as a "line of precedent holding certain punishments disproportionate when applied to juveniles"). That leaves two questions: one, whether those rules apply retroactively *in general*; and two, if so, whether either of their holdings map onto Petitioner's case. The first question is appropriately addressed by *Teague*, while the latter is best discussed in the context of § 2254(d), which allows for federal merits review if the State court's adjudication was "contrary to . . . clearly established" Supreme Court holdings.

On the first of these questions—whether *Graham* and *Miller* apply retroactively—the answer is yes. Substantive rules which "prohibit[] a certain category of punishment for a class of defendants because of their status or offense" apply retroactively. *Montgomery*, 577 U.S. at 206 (quotation omitted). *Montgomery* squarely held that *Miller* establishes a substantive rule that applies retroactively. *Id.* at 212. And though the court did not explicitly address whether the same is true for *Graham*, its logic applies to that case with equal or greater force; *Graham* prohibits a category of punishment (a life in prison) for a class of defendants (juveniles) because of their status (as juveniles) and their offense (non-homicides). It is thus unsurprising that *Montgomery* maintained that "*Miller* is no less substantive than are *Roper* and *Graham*." *Id.* at 209; *see also In re Sparks*, 657 F.3d 258, 262 (5th Cir. 2011) (finding *Graham* retroactive on collateral review "as a matter of logical necessity" (citing *Tyler v. Cain*, 533 U.S. 656, 668–69 (2001)); *In re Moss*, 703 F.3d 1301, 1303 (11th Cir. 2013) (same); *Moore v. Biter*, 725 F.3d 1184, 1190 (9th Cir. 2013) (same).

Accordingly, if *Graham* or *Miller*'s rules bear on Petitioner's claim, *Teague* presents no bar to applying them.

## II.   28 U.S.C. §2254(d)

The more difficult question is the second one:   whether the State's conclusion on Hauschild's claim should receive deference.   Under AEDPA's 1996 amendments to the federal habeas statute, this court is barred from granting relief on any claim "adjudicated on the merits in State court proceedings" unless the State-court adjudication either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).   Clearly established law in this context "includes only the holdings, as opposed to the dicta, of th[e] Court's decisions."   *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012)).

Whether the state's application was "contrary to" or an "unreasonable application of" that law presents "two separate standards."   *McNary v. Lemke*, 708 F.3d 905, 913 (7th Cir. 2013).   A decision is "contrary to" clearly established federal law "if the state court applies a rule different from the law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Court] on a set of materially indistinguishable facts."   *Rhodes v. Dittmann*, 903 F.3d 646, 655 (7th Cir. 2018) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)).   Most relevant here, a State decision is "contrary to" clearly established law "if it applies the wrong legal standard established by Supreme Court precedent . . . ."   *Kamlager v. Pollard*, 715 F.3d 1010, 1015 (7th Cir. 2013).   A State court's decision will be deemed an "unreasonable application" of Supreme Court holdings only if the decision is objectively unreasonable—not just "clear error," but "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."   *Harrington v. Richter,* 562 U.S. 86, 103 (2011). These standards are "intentionally 'difficult to meet,'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)), but the high deference demanded by §

2254(d) demands "does not imply abandonment or abdication of judicial review," *Miller–El v. Cockrell,* 537 U.S. 322, 340 (2003).

In carrying out the required deferential review, the court addresses three issues. First, the court defines what "clearly established" law, as announced in U.S. Supreme Court holdings, applies to Petitioner's claim. Second, the court asks whether the State court's last adjudication on the merits of Petitioner's claim was either contrary to or an unreasonable application of that clearly established law. *See Yarborough v. Alvarado*, 541 U.S. 652, 660–63 (2004) (engaging in this order of analysis). Finally, if the adjudication was contrary to or an unreasonable application of clearly established law, the court must conduct its own, *de novo* merits review of Petitioner's constitutional claim. *See Thomas v. Clements*, 789 F.3d 760, 768 (7th Cir. 2015) (proceeding to *de novo* merits review where state court decision unreasonably applied clearly established law); *see also Rainer v. Hansen*, 952 F.3d 1203, 1207 (10th Cir. 2020) (reaching *de novo* review of the merits of petitioner's claim after finding state court's decision was contrary to *Graham*).

### A.    Clearly Established Law

The case law relevant to Petitioner's claims was laid down in *Graham* and *Miller*, discussed below.

#### 1.    *Graham*

The *Graham* Court "h[eld] that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." 560 U.S. at 74. For juvenile defendants who did not commit homicide, the Court held that "the State must" afford "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. That "meaningful opportunity" could be provided by a sentence lower than life, or it could be provided by a life sentence with an opportunity to make a case for parole within the offender's lifetime (i.e. before the life sentence ends). That holding arose from the prosecution of Terrance Jamar Graham, a Florida teenager who committed multiple robberies in his youth. In June 2003, at the age of 16, Graham (along with some other "school-age youths") tried to rob a barbeque

restaurant in Jacksonville, sneaking in through the back door and hitting the manager on the head with a metal bar. *Id.* at 53. Graham was arrested and charged as an adult with armed burglary with assault or battery (carrying a maximum sentence of life without parole); and with attempted armed robbery (which carries a maximum sentence of 15 years). *Id.* at 53–54. After Graham pleaded guilty and promised to "turn [his] life around," the court "withheld adjudication of guilt as to both charges and sentenced Graham to concurrent 3-year terms of probation," with the first year spent in county jail. *Id.* at 54. But within six months of his release from jail, and just weeks before his 18th birthday, Graham committed two crimes in one day and was caught and arrested that night. *Id.* at 54–55. According to the State, that night, Graham and two others had committed a home invasion and held its occupant at gunpoint while looking for money, and then, later that night, attempted a separate robbery in which one of Graham's accomplices was shot. *Id.* at 54. Graham dropped his injured accomplice off at the hospital; when driving away, an officer signaled Graham to stop his car, in response to which he sped off and hit a telephone pole. *Id.* at 54–55. Detectives interviewed Graham later that night and, when they asked him how many robberies he had participated in, he responded, "[t]wo to three before tonight." *Id.* at 55.

At a hearing on these probation violations, Graham "admitted violating probation conditions by fleeing," even though "the court underscored that th[at] admission could expose him to a life sentence on the earlier charges [arising from the Jacksonville restaurant burglary] . . . ." *Id.* Ultimately, the trial court concluded that "Graham . . . had acknowledged violating his probation," in part by fleeing and also "by committing a home invasion robbery, by possessing a firearm, and by associating with persons engaged in criminal activity." *Id.* Later, at his sentencing hearing, Graham's attorney requested a sentence of 5 years; the Florida Department of Corrections, in a presentence report, recommended "at most 4 years"; and the State "recommended that Graham receive 30 years on the armed burglary count and 15 years on the attempted armed robbery count." *Id.* at 55–56. The judge, ultimately, "found Graham guilty of the earlier armed burglary and attempted armed robbery charges," and sentenced him to "life

imprisonment for the armed burglary and 15 years for the attempted armed robbery." *Id.* This effectively amounted to a life in prison without parole because Florida had no parole system; Graham had "no possibility of release" other than executive clemency. *Id.* at 57.

Graham's state court appeals failed, but the Supreme Court granted certiorari and held that the foreclosure of "some realistic opportunity to obtain release before the end of [a juvenile non-homicide offender's] term" violated the Eighth Amendment. In reaching that conclusion, the Supreme Court stressed that juveniles have "twice diminished moral culpability." *Id.* at 69, 82. First, as their minds are still developing, they lack maturity or a "sense of responsibility," and can be "vulnerable or susceptible to negative influences and outside pressures, including peer pressure . . . ." *Id.* at 68 (quoting *Roper v. Simmons*, 543 U.S. 551, 569–70 (2005)). Thus, the Court noted, it can be hard to tell whether a juvenile's crimes are driven by "unfortunate yet transient immaturity" or instead confirm "irreparable corruption." *Id.* (quoting *Roper*, 543 U.S. at 573). Second, the Court recognized "a line 'between homicide and other serious violent offenses against the individual.'" *Id.* at 69 (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 438 (2008)). "[D]efendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 69. Specifically, the Court stressed the "severity and irrevocability" of death—that, unlike even a "serious nonhomicide crime," homicide is final and irreparable. *Id.* (quoting *Kennedy*, 554 U.S. at 438).

In light of these considerations, the Court concluded that, though not as severe as the death penalty, Graham's life sentence "deprives [him] of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence." *Id.* at 69–70. In other words, such a severe sentence "means denial of hope . . . ." *Id.* (quoting *Naovarath v. State,* 105 Nev. 525, 526, 779 P.2d 944 (1989)). Such a punishment is "especially harsh . . . for a juvenile," the Court observed, because, sentenced early in life, a juvenile defendant "will on average serve more years and a greater percentage of his life in prison than an adult offender." *Id.* at 70. "This reality," to the Court,

"cannot be ignored." *Id.* at 71. The Court acknowledged that there is no dispute about the need to imprison a youth who, like Graham, poses an "immediate risk" to society, but stated that "it does not follow that he would be a risk to society for the rest of his life." *Id.* at 73. The sentence imposed on Graham was therefore unacceptable:

> Terrance Graham's sentence guarantees he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the bad acts he committed as a teenager are not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes.

*Id.* at 79. Put differently, though the "State's judgment that Graham was incorrigible" could turn out to be true—and thus warrant his being denied parole down the road—"the sentence was still disproportionate because that judgment was made at the outset." *Id.* at 73. Accordingly, the Court concluded its opinion with the following paragraph encapsulating its holding:

> The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A state need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term.

*Id.* at 82.

### 2. *Miller*

*Miller v. Alabama* extended the reasoning of *Graham*, and held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. at 465. Rather, before imposing a life without parole sentence in juvenile homicide cases, the sentencing judge must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

The case addressed two separate petitioners: Kuntrell Jackson and Evan Miller. Jackson was charged with capital felony murder and aggravated robbery after he, then a 14-year-old, and two other boys tried to rob a video store in Arkansas and, in the process, one of the other boys shot and killed the store clerk. *Id.* at 465–66. Jackson was tried and convicted as an adult, and

the state's sentencing scheme mandated a sentence of life without parole. *Id.* at 466. Evan Miller also was convicted for a murder that he committed at the age of 14 in Alabama. He and his friend, Colby Smith, followed a man named Cole Cannon back to his trailer one night after Cannon completed a drug deal with Miller's mother. *Id.* at 468. The three of them "smoked marijuana and played drinking games." Then, when Cannon fell asleep, Miller took Cannon's wallet and divided the $300 inside it with Smith. As the boys attempted to return the wallet to Cannon's pocket, Cannon awoke and "grabbed Miller by the throat," and Smith responded by striking Cannon with a baseball bat. Miller too seized the bat and beat Cannon with it repeatedly. The assault ended when Miller placed a sheet over Cannon's head and, before he struck a final blow, announced, "I am God, I've come to take your life." *Id.* The boys fled the trailer, but returned soon afterwards and set fire to the trailer in order to "cover up evidence of their crime"; Cannon died of some combination of injuries and smoke inhalation. *Id.* Miller was charged as an adult, and a jury found him guilty of murder in the course of arson. *Id.* at 468–69. He received the mandatory minimum of life without parole. *Id.* at 469.

Jackson appealed his conviction, but not his sentence, and the Arkansas Supreme Court affirmed. *Id.* at 466. Miller did challenge his sentence, but the Alabama Court of Criminal Appeals affirmed, believing his punishment was not unduly harsh in comparison to his crime, and the Alabama Supreme Court denied review. *Id.* at 469. The Supreme Court granted certiorari in both cases. *Id.*

The Court relied on the reasoning in *Graham* and *Roper* to conclude that a statutory scheme mandating life without parole for juvenile offenders simply "poses too great a risk of disproportionate punishment." *Id.* at 479. To the Court, the "mitigating qualities of youth"—including "immaturity, irresponsibility, impetuousness . . . recklessness," susceptibility to social pressures and "psychological damage," and the transience of these qualities—mandated individualized treatment before sentencing a youthful offender to die in prison. *Id.* at 476. The Court ended its opinion with this statement:

> By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory-sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment.

*Id.* at 489. With these clearly established holdings in mind, the court turns to the Illinois Appellate Court's treatment of Hauschild's petition.

**B.** **The Illinois Appellate Court's Decision was Contrary To Clearly Established Supreme Court Law**

As noted above, under AEDPA's deference regime, a State court's decision is contrary to clearly established law if it "applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell*, 535 U.S. at 694 (2002). Even a reasonable application of a test the state court "never should have applied . . . in the first place" clears AEDPA's "hurdle." *Ford v. Wilson*, 747 F.3d 944, 952–53 (7th Cir. 2014). And to make that determination, the court must analyze "the 'last state-court adjudication on the merits of' the petitioner's claim." *Brown v. Davenport*, 596 U.S. 118, 141 (2022) (quoting *Greene v. Fisher*, 565 U.S. 34, 40 (2011)). Here, the Illinois Appellate Court's third decision in Hauschild's case represents the final adjudication on the merits, since the Illinois Supreme Court denied him leave to appeal. *See McNary v. Lemke*, 708 F.3d 905, 913 (7th Cir. 2013) (where Illinois Supreme Court had denied leave to appeal, looking to Illinois Appellate Court's decision when applying § 2254(d) to habeas petition); *see also Brown*, 596 U.S. at 142 (noting that "a discretionary denial of leave to appeal does not typically entail an 'adjudication' of the underlying claim's 'merits' under AEDPA's terms.")

Two recent cases from this circuit prove instructive in determining when a state court's decision is contrary to clearly established law. In *Thomas*, 789 F.3d at 767–68, the Seventh Circuit held that AEDPA deference did not apply to a Wisconsin court's decision denying a defendant's ineffective assistance of counsel claim, because the Wisconsin court had misstated the legal standard for how to show prejudice under the test articulated in *Strickland v. Washington*,

466 U.S. 668 (1984). *Strickland* required showing that but for the counsel's errors, there was a "reasonable probability" the result would have changed; the state court instead claimed that the relevant inquiry was whether "his trial counsel's failure . . . would have led to a different result at trial." *Thomas*, 789 F.3d at 767. Nor was it relevant that, notwithstanding its incorrect framing of the test (and absent evidence to the contrary), the state court nonetheless could have applied the correct test in analyzing Thomas's claim without saying so. *Id.* (stressing that there is "no evidence in the decision that it applied the proper standard"). In another instructive case, *Washington v. Boughton*, 884 F.3d 692, 702 (7th Cir. 2018), the Seventh Circuit refused to apply AEDPA deference to a state decision that upheld a trial court's appointment of counsel for a defendant who did not want a lawyer; the state court had given "no mention of" the applicable test found in *Faretta v. California*, 422 U.S. 806 (1975), and instead relied on other cases that applied a comparably "heightened competency standard" to a defendant's request to proceed pro se.

In Hauschild's case, as in *Washington* and *Thomas*, the Illinois Appellate Court applied the wrong standard. *Graham* holds that, for "a juvenile offender who did not commit homicide," the Eighth Amendment prohibits a sentence of life without parole and instead requires "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 74–75. Hauschild is (1) a juvenile offender who (2) did not commit homicide. The relevant inquiry, then, is whether Hauschild's sentence categorically bans him from a meaningful opportunity to seek release based on demonstrated maturity and rehabilitation. But the Illinois Appellate Court never addressed that question. Instead, the court applied *Miller*'s test, not *Graham*'s, asking simply whether the judge had adequately considered Hauschild's incorrigibility *before* sentencing him to what the court concluded was equivalent to a life without parole sentence. *Hauschild (2022)* ¶ 28 (finding that "the record clearly shows that the sentencing judge considered all that *Miller* requires" before sentencing Hauschild to a *de facto* life term). In doing so, the court incorrectly assumed that the relevant inquiry was whether Hauschild's sentence was *mandatory*, stating that "[l]ike *Graham* and *Miller* before it, the constitutional infirmity identified in

*Reyes* and *Buffer* was the mandatory character of the defendant's sentence . . . ." *Hauschild (2022)* ¶ 25.

But *Graham* explicitly rejected this notion; it is a categorical ban on a *species* of punishment, mandatory or not. *Graham*, 560 U.S. at 76 (holding that Florida's laws violated the Eighth Amendment because they did not "prevent[] . . . [a judge] from sentencing a juvenile nonhomicide offender to life without parole based on a subjective judgment that the defendant's crimes demonstrate an 'irretrievably depraved character'" (quoting *Roper*, 543 U.S. at 572).) The question of whether a judge's decision to sentence a juvenile to life without parole is mandatory or discretionary is thus not dispositive where the conduct of conviction falls into the category of offenses considered in *Graham*—that is, non-homicide offenses. For juvenile offenders who did not commit homicide, *all* sentences to life in prison with no meaningful opportunity for release— even when discretionarily imposed—are unconstitutional. Applying *Miller*'s test to Hauschild's sentence had no bearing on its constitutionality and was thus "contrary to" clearly established Supreme Court precedent under § 2254(d).

Rather, *Graham* plainly applies to Petitioner's claim. The court has entertained potential distinctions, but none appear to provide a basis for finding *Graham*'s holding inapplicable. First, some courts have addressed the question of whether attempted murder classifies as a homicide offense; all but one (in an unpublished opinion) have held that it is not. *See Rainer v. Hansen*, 952 F.3d 1203, 1208, 1208 n.3 (10th Cir. 2020) (compiling cases and noting that the only two cases to gesture at the opposite conclusion were an unpublished opinion "without analysis" and an opinion that expressly refused to address the question but suggested as much in dicta (citing *Twyman v. State*, 26 A.3d 215 (Del. 2011) (unpublished); *People v. Gipson*, 393 Ill. Dec. 359, 34 N.E.3d 560, 576 (1st Dist. 2015) (in dicta, expressing doubt that attempted murder is a nonhomicide offense))); *see also Sanders v. Eckstein*, 981 F.3d 637, 641 (7th Cir. 2020) (classifying *Graham*'s holding as applicable to "juvenile offenders sentenced to life imprisonment without the possibility of parole for a crime other than a homicide"). This conclusion is

unsurprising, since *Graham* is explicit on this point: "This Court now holds that for a juvenile offender *who did not commit homicide* the Eighth Amendment forbids the sentence of life without parole." *Graham*, 560 U.S. at 74 (emphasis added); *see also id.* at 71, 72, 80, 82 (repeatedly cabining its holding to juvenile offenders "who did not commit homicide"). Nor was the Appellate Court mistaken on this score. *See Hauschild (2022)* ¶¶ 2, 23, 26 (noting that Hauschild's petition challenged the constitutionality of his sentence for "multiple nonhomicide crimes, committed when he was 17" and never questioning that description of his offense).

A second possible basis for distinguishing *Graham* in this case is that Hauschild's 67-year sentence, with eligibility for parole after about 57 years, *did* afford him a "meaningful opportunity" for release and thus does not qualify as a life without parole sentence. But the state court itself explicitly rejected that argument. *Hauschild (2022)* ¶ 22 ("[W]hether one considers the issue just under *Buffer* and *Dorsey*, or even just in general, there is no merit to the State's position that Hauschild's 67-year sentence was somehow *not* a *de facto* life term." (emphasis in original)). By the Illinois Appellate Court's (and the state of Illinois') own logic, then, Hauschild received a sentence equivalent to that found unconstitutional in *Graham*.

That leaves just one argument, the only one that the Illinois Appellate Court explicitly levied as a "point of distinction" from *Graham* and other applicable precedent: the number of offenses. According to the Illinois court, Graham "was given a life sentence for a single nonhomicide offense" while Hauschild was sentenced for "four violent felonies . . . ." *Hauschild (2022)* ¶ 26. Courts have differed on whether *Graham*'s clearly established holding for purposes of AEDPA review is properly cabined to only a life sentence imposed on a single charge. *Compare Bunch v. Smith*, 685 F.3d 546, 550 (6th Cir. 2012) (finding that *Graham* did not clearly establish whether "consecutive, fixed-term sentences for juveniles who commit multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life without parole") *and Lucero v. People*, 2017 CO 49, ¶ 13, 394 P.3d 1128, 1131 (same), *with Moore v. Biter*, 725 F.3d 1184, 1186 (9th Cir. 2013) (finding that state's refusal to apply *Graham*

to 254-year consecutive-term sentence for multiple offenses was contrary to clearly established law); *Budder v. Addison*, 851 F.3d 1047, 1055 (10th Cir. 2017) (finding *Graham*'s clearly established holding prohibited *de facto* life sentences regardless of the "number or severity of th[e] offenses").

By this court's reading, *Graham*'s holding clearly encompasses sentences imposed on juveniles who have been charged for multiple offenses.  As the Tenth Circuit noted in *Budder*, "[a]t no point did the Court draw any distinctions with regard to the severity or number of nonhomicide crimes a defendant had committed or indicate that anything short of homicide would rise to the level of moral culpability that could justify a sentence of life without parole for a juvenile offender."  851 F.3d at 1057.  Instead, *Graham* "structured a categorical rule specifically to prevent" the kind of "case-by-case proportionality approach" the Illinois Appellate Court adopted here.  *Id.* at 1058.  Indeed, the Court in *Graham* explicitly faulted Florida's regime for allowing "its courts [to] sentenc[e] a juvenile nonhomicide offender to life without parole based on a subjective judgment that the defendant's *crimes* demonstrate an 'irretrievably depraved character.'" *Graham*, 560 U.S. at 76 (emphasis added) (quoting *Roper*, 543 U.S. at 572).

Moreover, the facts in *Graham* itself demonstrate that its holding extends beyond sentences for single offenses.  Terrance Graham was found guilty of multiple offenses—armed burglary and attempted armed robbery—and was "sentenced . . . to the maximum sentence authorized by law on *each charge* . . . ."  *Graham*, 560 U.S. at 56–57 (emphasis added).  And in sentencing him to life on one of them (and fifteen years on the other), the judge simultaneously considered the two other felonies Graham had committed during his probation.  *Graham*, 560 U.S. at 56–57 (citing Graham's "escalating pattern of criminal conduct" when opting for a life sentence).  Indeed, the Supreme Court's characterization of Graham's sentence is consistent with this reading; it describes the First District Court of Appeal of Florida "concluding that Graham's sentence was not grossly disproportionate to his *crimes*."  *Id.* at 58 (emphasis added).

26

This court thus declines to read *Graham* so narrowly as to prohibit Terrance Graham's life sentence—for one offense but charged alongside another, and where the sentence's extremity itself was the product of consideration of additional crimes—but not Hauschild's, a sentence for four offenses arising out of a single home invasion. *Graham* itself referenced offenders with multiple crimes and charges in its analysis without drawing any distinction. And, as the Tenth Circuit noted in *Budder*, the opposite result would allow "states . . . [to] circumvent the strictures of the Constitution merely by altering the way they structure their charges or sentences." 851 F.3d at 1057–58. Even under AEDPA's deferential standard, nothing about the severity or number of Hauschild's convictions distinguishes his case from the facts or holdings of *Graham*.[8]

By applying *Miller*'s test instead of *Graham*'s, the Illinois Appellate Court issued a decision that was contrary to clearly established Supreme Court precedent. The court thus turns to the merits of Hauschild's case.

**III.     The Merits of Petitioner's Claim**

The court has already covered most of the ground relevant to the merits of Hauschild's petition. Because Hauschild was a juvenile who committed a nonhomicide offense, the only question the court must ask is whether his 67-year sentence afforded him a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75. The court concludes that it did not.

---

[8]     It is unclear whether the Illinois Appellate Court's reasoning for applying the wrong test would itself be subject to § 2254(d) deference. Were this the case, the court presumes it would need to ask whether the Illinois Appellate Court's conclusion—that Hauschild's multiple offenses distinguished his case from *Graham*'s facts and thus permitted harsher punishment—*itself* was an "unreasonable application" of *Graham*. But given the fact that both *Graham* and Hauschild's case concerned multiple offenses, and that by the state's own logic the sentences in each case were equivalent, the court would have no difficulty concluding that this standard was also met. *See Williams v. Taylor*, 529 U.S. 362, 407 (2000) ("A state-court decision . . . involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or *unreasonably refuses to extend that principle to a new context where it should apply*." (emphasis added)).

The Seventh Circuit has made explicit that *Miller* and *Graham* "cannot logically be limited to *de jure* life sentences, as distinct from sentences denominated in number of years yet highly likely to result in imprisonment for life." *McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016) (vacating denial of a habeas petition filed by juvenile offender); *see also Sanders*, 981 F.3d at 641 (noting that "the Eighth Amendment prohibits not only *de jure* life sentences, but also *de facto* life sentences—a term of years so long as to equate for all practical purposes to a life sentence.") And though this circuit has never explicitly said so, its cases suggest that the line at which a term-of-years sentence becomes a *de facto* life sentence is at or slightly below the offender's life expectancy. For example, in *Kelly v. Brown*, petitioner sought habeas relief from his sentence for a double murder committed at age 16, a sentence that rendered him ineligible for parole until age 70. *Kelly v. Brown*, 851 F.3d 686, 687 (7th Cir. 2017). The court observed that petitioner had "stated a possible claim to relief under *Miller* . . . ." Ultimately, the Seventh Circuit concluded that "Kelly was afforded all he was entitled to under *Miller*," particularly in that "[t]he sentencing court . . . considered his age when deciding on the appropriate term." *Id.* at 687–88. In other words, *Miller*'s exception applied because the judge considered Kelly's youth at sentencing—but the *Kelly* court appears to have assumed that *Miller*'s ban on a mandatory life without parole sentence was implicated by a term-of-years sentence under which he could not seek release before reaching age 70. And other cases in this circuit seem to toe a similar line. *See Sanders*, 981 F.3d at 643 (finding no de facto life sentence when offender would be released at age 51, and locating this analysis in a discussion of life expectancy tables); *McKinley*, 809 F.3d at 910–11 (finding that 100-year sentence was de facto life sentence, because absent some "radical increase, at present unforeseeable, in longevity," such a sentence was un-survivable); *Krol v. Calhoun,* No. 16 CV 11595, 2019 WL 5592757, at *14 (N.D. Ill. Oct. 30, 2019), *aff'd sub nom. Krol v. Kennedy*, 818 F. App'x 547 (7th Cir. 2020) (finding no de facto life sentence when petitioner would be released at 56); *Mitchell v. Greene*, No. 18-CV-04317, 2021 WL 1998237, at *8 (N.D. Ill. May 18, 2021) (same with release at 57); *United States v. McDonald*, 981 F.3d 579, 581 (7th

Cir. 2020) (citing life-expectancy tables in finding no de facto life sentence for man whose 13-year prison term meant he would be released only 5 years before his life expectancy).[9]

Regardless of what specific line is appropriate—a question the court does not definitively answer here—Hauschild's sentence fell on the wrong side of it. Hauschild's sentence makes him ineligible for parole until he is at least 74 years old. As he pointed out in his state collateral proceedings, this means that parole would only become available to him a few years beyond his average life expectancy. See People v. Hauschild, 2015 IL App (2d) 131040-U ¶ 7.[10] In short, a 67-year sentence, with no eligibility for parole until he is 74 (an age he is statistically unlikely to reach), does not afford Hauschild a "meaningful opportunity to obtain release" based on subsequent growth.[11] As the Court stressed in Graham, the sentence gives him no chance to "demonstrate that the bad acts he committed as a teenager are not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes." 560 U.S. at 79 (emphasis added). Tellingly, a half century puts most juvenile offenders right around, if a decade-or-so under, the age Hauschild will be when eligible for parole.

The court stresses that the relief it affords Hauschild is modest; Graham merely requires that he be given the chance to apply for parole some time before his life expectancy ends. And the court expresses no opinion as to whether, in Illinois, Buffer mandates he be given a parole opportunity earlier than that. Those decisions are properly left to the sentencing court. Indeed,

---

[9]    Some courts outside this circuit have explicitly drawn the line at or below the life expectancy of the offender. See, e.g., State v. Moore, 2016-Ohio-8288, ¶ 48, 149 Ohio St. 3d 557, 569, 76 N.E.3d 1127, 1137–38; United States v. Grant, 887 F.3d 131, 151 (3d Cir.), reh'g en banc granted, opinion vacated on other grounds, 905 F.3d 285 (3d Cir. 2018), and on reh'g en banc, 9 F.4th 186 (3d Cir. 2021) (drawing the line at retirement age).

[10]    Hauschild never offered statistics suggesting a much lower life expectancy— around 51—for those serving life sentences, as did the petitioner in Sanders (represented by counsel in successfully appealing the denial of habeas relief). See Sanders, 981 F.3d at 642–43; see also Kelly, 851 F.3d at 688 (Posner, J., dissenting) (pointing to the same study).

[11]    The court expresses no opinion on Illinois' decision to draw the line at 40 years, which appears to be a lower ceiling than average life expectancy.

Hauschild was convicted of horrible crimes, and he may well spend the rest of his life behind bars. But the Constitution requires that he be given the chance to show that his having broken into a home—to steal $10,000 and move to New York to become a rapper—betrayed a sickening and tragic, but transient, immaturity. Because his current sentence denies him that chance, it violates the Eighth Amendment.

## <u>CONCLUSION</u>

For the foregoing reasons, Hauschild's Petition is granted. The case is remanded to the state courts with instructions to resentence Hauschild within 60 days. This ruling is final and appealable.

ENTER:

Dated: May 2, 2024

_____
REBECCA R. PALLMEYER
United States District Judge